May it please the Court, Kathy Bank, you bring on behalf of the appellants Dr. Talmadge King, Dr. Lee Goldman, and Dr. Michael Bishop. Dr. King and Dr. Goldman are actually here with me this morning in the first row, Dr. King and Dr. Goldman to Dr. King's left. I'd like to reserve five minutes for reply. We're also well aware that this Court is thoroughly familiar with the principles of qualified immunity set forth in the Anderson case in Saussure and most recently the I have an area of unfamiliarity I need help on. One question is, do we have jurisdiction? As I understand it, if there is an issue of fact that would affect the qualified immunity under current circuit law, we do not have jurisdiction over the interlocutory appeal. And what I'm wondering is, if we conclude that that is so, does that mean we're all done and we don't reach the question of whether a reasonable official would have known that Dr. Embry would or would not have known that Dr. Embry had a property interest in his employment? No, Your Honor, that's not the case. And I believe the panel just denied the motion to dismiss it for summary of affirmance on that very ground. But there certainly can be issues of fact in connection with various aspects of qualified immunity. But for ---- Did we recite a ground when we denied it? Yes. So that certainly if there is a dispute as to whether something was said or not said, that is not going to detract from the qualified immunity analysis or the ability of this Court to act if the motion is made on the basis assuming everything that the plaintiff alleged is true. So we don't need to get into a question of fact about what is true and what's not true. But even assuming every allegation is true, if the position is that those allegations still do not add up to a constitutionally protected interest, or if they do, if it was not clearly established at the time, this Court can certainly proceed to decide the issue of qualified immunity. Does that respond to your answer? So you would say if we assume that Dr. Embry was assured that he had the moral equivalent of tenure, even so, under Adelson, a reasonable university official would not have jurisdiction and they have qualified immunity. If I understand your question is, even if you assume that he was told in 1986 that the in-residence appointment carried the moral equivalency of tenure, is ---- can we still make the argument that there was no protected property interest in 1989 or 1999 and whether or not it was clearly established? And the answer is yes. I didn't say can you still make the argument. I said would a reasonable university official have known? Yes, absolutely. And here's the reason why. All of these arguments that they make really sort of end at the period of 1994. And what we need to look at is what were the terms and conditions of his appointment in 1998 and 1999. And this is what happened. He lost his funding. Dr. King arrived at San Francisco General. They sat down and they talked about the absolute necessity to restore funding. Is that all uncontroverted? Yes, that is all uncontroverted. And then the following May, 1988, Dr. King authored a letter to Dr. Emory that said here is the offer that we are making to you. We are offering to allow you a six-month sabbatical in order to prepare new proposals to try and obtain funding. We will support you with department funds for the next more than 18 months through December 31st, 1999, and ---- but you ---- it's incumbent upon you to obtain funding. That letter was then supplemented by the letter in September 1988 which specifically said this is to confirm the terms of your appointment, the terms of ---- Let me ask you something about that. Yes. Did anyone tell him all bets are off on that moral equivalent of tenure stuff that we told you four years ago or six years ago? That question really is Dr. King arrived and he was not aware of any such statement that was made approximately 15, allegedly 15 years earlier to Dr. Emory. Dr. Emory never once mentioned any such statement being made to him all the time that he was talking to Dr. King. So when Dr. King was talking and discussing about the terms and conditions of the upcoming appointment, he was never made aware. He was ---- I don't know if that helps. I don't actually see where it fits the argument. If somebody new that comes into the university and he doesn't know the deal that was made before he got there, the university is still bound by it. No, it's not, Your Honor. This was a new deal each year with respect to the terms and conditions of employment. And when you have an employee that sits down and talks to you about the terms and conditions that they're willing to agree to for your employment ---- Let me tell you what's bothering me about it. Okay. My wife's a professor. I'm real familiar with professors. She doesn't have a moral equivalent of tenure. She just has ordinary tenure. They're always pressuring professors to raise money to get funding. And some tenured professors do it, and they raise a lot of money. And some tenured professors just say, you know, I don't care about it. I don't want to be an administrator of a lot of acolytes. I just want to do my research and teach my classes. And they don't get funding. And they get pressured all the time, and they just more or less politely tell the administrators to get lost. I'm wondering whether, in this case, the pressure for funding was clear enough so that it was a condition of the job, or whether it was just the kind of pressure where you can tell them, well, that's what you would like me to do and this is what I would like to do. You know, absolutely, Your Honor. The university had two entirely separate tracks here. They had the true tenure track, the formal tenure track. Those people are supported by State funds. The State allocates those funds. The in-residence series does not have State funding. It is absolutely essential that they obtain funds. That has been specified in funding for — I just want to make sure I understand, because my spouse is a professor, too. What Judge Kleinfeld was talking about, I thought, was funding for research and for research assistants and stuff like that, not for funding of one's own position. This in-residence, as I understand it, meant that you had to get the funding for your own salary. You are absolutely correct, Your Honor, because the State simply does not have the funds to pay for these people. It's like being a lawyer. You have to basically go out and get your clients. In-residence professors need to go out and get their own funding. But let me ask you this, and then I'll ask the other side the same thing. What do you understand that the plaintiff wants in this suit, ultimately? Well, you know, Your Honor, that gets us right to that second question about whether this terminology, moral equivalent of funding, can even constitute an explicit term. Well, it wasn't moral equivalent of funding. It was moral equivalent of tenure. Tenure.  That's correct. But what does that mean? You have to have a mutually explicit understanding for two people to operate as to what the terms and conditions are. He, to this day, cannot define exactly what it is. But you know what he said in his complaint? His complaint alleged that he had the equivalent of tenure. He did not have the equivalent of tenure. Now, what relief do you understand that he wants? Does he want money? Does he want pay? Oh, yes. Oh, yes. No, he wants money. He wants damages for an alleged violation of his due process rights. Where in writing was he told that he was required to raise the money to cover his salary? That is in both the May letter and that is at excerpt of Record 249 and then 406. And it says right in there, it specifies the funding that the department is going to provide to him. And then in the APM 270, that is the academic procedures manual that was applicable to his, it says on page 686 of the excerpts of record, 50 percent or more of the base salary shall come from outside funds. And in this case, the funding condition was so severe that in the Department of Medicine, Dr. King required that 75 percent of it come from outside funding. It is absolutely critical to understand that this money does not exist to fund these positions in any way, shape, or form unless the professors obtain it from outside funds. And that's what's so important about in that 88, 89 year. They sat down and agreed in writing, Dr. Embry signed off that these were the terms and conditions of his employment. That is where? Those two letters, excerpts of Record 249 is the May letter that's very detailed. Before you run out of time. I know. I've got three seconds. Why don't you finish? Here, go sit down for five minutes. Finish your answer. I've got another question I have to ask you. Don't panic. It's more important that we get the information than that we look at the clock. We're not going to make you sit down. Relax. Thank you. Okay. That's what I wanted to hear. Okay. Justice Schroeder, did I answer your question? You didn't finish the page numbers. Okay. The May 1998 letter, which is very detailed in terms of the offer that's being made to Dr. Embry and sets forth exactly what the terms are, the six-month paid leave for the new grants, the funding from department funds, because he didn't have any outside funds until December 31st, 1999, the absolute necessity for him to get outside funding by December 31st, 1999. That's at 249. You need to try to obtain funds to offset the full cost of your salary for the six months of your leave. And then at four They're going to cover that. And even if he doesn't get them, they're still going to cover it. But then down on page 250, he's told, failure to achieve adequate support for your scale three base salary will result in termination of your appointment within the Department of Medicine effective January 1, 2000. And then that is followed up by the letter. It excerpts a record 406, which confirms the terms of his appointment, that summarizes what is in that letter. And it also specifically says that this appointment is pursuant to academic personnel manual part 270. It is explicit. Dr. Embree signed on to the dotted line that that was what was going to govern the terms and conditions of his appointment. It also told him exactly where he could get a copy, including online, so there was no excuse for him not reading it. And it says, as it's always said, that these positions require outside funding. They do not have tenure. They carry no security of employment. And furthermore, that an appointment for a specified term as this was expires by its own terms on the date of expiration. He had, it's undisputed, he had no funding as of December 31st. Let me get to another question with you. We're over time, but this bothers me. Okay. If I read the record right, and I'm not sure I did, I want you to educate me if I'm right, he wanted to meet with the people that had authority to get rid of him as he approached this deadline, and they would not meet with him and did not meet with him until he was already out, and then they met with him when it was all over and he'd been canned. Is that right? No. You don't have that right. Here's the chronology. Okay. Dr. King has been discussing with Dr. Embree the terms and conditions and the necessity of employment for two years. According to the explicit terms and conditions, which he signed off onto, his position was going to end December 31st, 1999. On December, I believe it was, 22nd, like three days before Christmas, Christmas holidays, there's not too many people around, including Dr. Goldman had already left for the holidays. For the very first time, Dr. Embree writes a letter to Dr. King and says, oh, is there any way we can extend my time because I don't have funding yet? And by the way, Dr. Smith told me 15 years ago I had the moral equivalent of tenure. No elaboration on what that meant. I'd really like to meet with you face-to-face. Dr. King got right back to him and said, Dr. Goldman isn't here. We'll set up a meeting as soon as we can. And he told campus council. Within two days after Christmas, campus council was already in communication with Dr. Embree's lawyer. There was no ignoring the situation. It's just that when somebody waits for two years before ever saying anything, and he'd do it the minute, you know, two days before Christmas, and as soon as you can meet several days after Christmas, there was responsiveness. Kagan. Thank you. I think we should hear from your adversary. We'll give you 30 seconds to respond on rebuttal if you feel you really need it. Thank you. Thank you, Your Honors. I am nursing a cold, so if my voice goes, I'm sure you will remind me. We'll hold it against you. Well, my son does. There's no reason you shouldn't also. At first, I feel I'm a little at a loss. My wife is only a schoolteacher. I was going to university professor. I want to start by actually answering a couple of questions that were asked to Ms. Behnke. In terms of the summary affirmance, it was denied without comment. There was no reason for the decision. As to the last issue about the sequence of events prior to the termination, if you look at that. On that point, is she right? We accept the facts in the light most favorable to you. Oh, she's right on that. Okay. Right. But the problem is, is once she admits to the law, she then ignores it in the argument that she makes. So long as we're lined up right, we take the facts in the light most favorable to your side when we decide this issue. Correct, including all implications from all of the facts. And what in the world does moral equivalent mean? It doesn't mean to me anything in terms of tenure. It means moral equivalent. How do you get legal tenure out of moral equivalent? If you look at the record, the record does define it. If you look at the deposition testimony and the testimony of Dr. Schlesinger, Margolis, and Smith, both in this case and in the Halter hearing, and if I could not garris for a moment, Your Honor, the Halter hearing was sworn testimony, which the university had at the time that they decided to terminate Dr. Embery. So if they wanted to know what Dr. Smith promised, they could have gone to the sworn testimony, and what they would have found, excuse me, according to Dr. Schlesinger, who was the assistant head of the Department of Medicine at the time that all of these the same rights and privileges as ladder rank faculty, period, end quote. I still don't see where that gets you, because it appears to me from the written record in this case that everything was dependent on your clients being able to secure funding to pay his salary, and that failed. We disagree, Your Honor. If you go back to the original promises, which under Adelson and even if you look at Chang and Lagos have basically bind the university, there was no conditions based that given Mr. or Dr. Embery or any of the people that they hired that this moral equivalency was contingent upon funding. You were told you were you are as if you have tenure. And this is not a ---- We have at that time was the understanding that people in this track had to secure funding for their positions? It was. Some did. Some didn't. They had the university had latitude. But this is the point, Your Honor. Now, that's a murky answer, and I don't understand it. What track was your client on? There was technically he was not on a tenure track. What does technically mean? I mean, every time I hear a word like that, it makes me ---- makes my teeth chatter because it's a way of trying to avoid the truth. What track was your client on? He was on a ---- there is no track as the term track means. Was he a tenured professor getting paid by the university at all times? He was not. He did not have formal tenure. Okay. What was he then? He had the university promise him that even though he did not have formal tenure, they would treat him as if he did. Now, I don't care about the promise right now. I'm asking you what kind of an understanding was there outside of this promise that you're saying that was there. That he would be treated as if he had tenured. Okay. Never mind. Would you just explain to me what your client wants? A hearing, Your Honor. That's simple. A hearing for what? For whether or not the university had grounds to terminate him. When you say a hearing, do you mean a trial? Well, we want not a trial in the sense of a court trial, but that there is a privilege and tenure committee that the university has that hears grievances or decisions by the university to let him ---- All he wants is a hearing before the university terminates him? Not monetary damages? Well, he wants the back pay, which he's entitled to. What back pay is he entitled to? He would be entitled to ---- Who was going to pay him? It would be the individual defendants, Your Honor. Those are the ones ---- No. I mean, what pay was he ---- if you're fired wrongly and so you're entitled to get paid if you're still in your job, that's one thing. But the ---- if just ---- how is he ---- where is his ---- where is he, if he has his salary, is he? He's not entitled to future salary, Your Honor, because he has the hearing and possibly his job back. But what he's entitled to under the law is the pay from which the date of his termination until the date of the decision, until the date of his procedural due process is given to him. That's the back pay he's entitled to. Is it right that he didn't ask for hearing until a couple days before Christmas of the year when, as of December 31, he'd be out? No. He is entitled to one. Is it right? Yes. It's factually correct? I believe ---- Listen to the questions and I'll help you. I'm sorry, Your Honor. I believe that he ---- it is irrelevant whether he asked for hearing or not. I didn't ask about the legal consequence. It is right. I just want to know if it's factually correct. He asked ---- excuse me. He asked for a hearing approximately a week or two before, but he ---- Yeah. Was it December 22? I believe, Ms. Banke, he's correct on that date. Okay. And that was the year of termination? Correct. Now, what would he have done at a hearing? What was there to do at a hearing? I mean, if the only issue is, Dr. Embry, you're a great guy, great professor, but you haven't raised money to cover your salary, goodbye. Well, Dr. Embry was ---- that would have been discussed at the informal hearing prior to termination. That would have been discussed. But Dr. Embry is also entitled to a formal hearing in front of the privilege of the tenure committee subsequent to the decision. What's the hearing about? What do you do at the hearing? First of all, it was ---- they would determine whether or not there were grounds for the termination. In other words, would the sufficient cause exist to terminate Dr. Embry from his position? Is there a factual dispute about whether he raised money that would cover his salary? During that ---- during a couple-year period, no, there's not. But ---- He did not raise the money. He did not. But what would have happened was, if they had given him the hearing, he would have gotten the funding, because the funding came in approximately several months after the decision to terminate. He actually did get the money. The grants were pending at the time. Oh, you mean all he needed was a delay, the money came in? Yes. Yes. And the record is also uncontradicted as to that point. But the point that would be made, Your Honor, is even if the committee ultimately would have decided to terminate him because of the funding, that doesn't mean that they didn't have to give him the hearing. And that's the point that we make. Where in the record is it, did he tell the defendants that the money was coming in effective such-and-such? It's ---- Your Honor, I don't have it on the tip of my tongue, but if you give me a moment, I can give you a second to cite to the ---- In your briefs? It is in the brief, Your Honor. I missed this. You sure? Basically, the situation was the money was coming, and the money actually did come? Your Honor, what the record will show is the grant in front of the NIH was pending and that the grant was approved. Well, that can take forever. Well, Your Honor, I'm just telling you what the record shows. I understand that technically it can't. But the point is that this is where I think we diverge significantly from the other side, is we don't even believe the issue of funding was the reason why he was terminated. So there is a legitimate factual dispute here as to what were the reasons why they let him go. If you go back to the Margaretten letter, which we cite in the brief, prior to the whole funding controversy, Dr. Margaretten wrote to Dr. King that we're going to terminate Dr. Enberry. So this whole idea of was it funding or was it not is actually a red herring. That's a factual dispute in this case which you have to resolve at this point in favor of Dr. Enberry. So the issues as it goes to you is a decision to terminate, regardless of the funding issue. Where is it in the record that it was for a different reason? It doesn't say the reason. But, Your Honor, it was prior to, in terms of the dates, the whole controversy on funding. Well, let's say he wasn't. Let's say the real reason they wanted to fire him was that sexual harassment claim that he was at — I can't remember exactly what the disposition was, but it was not entirely favorable to Dr. Enberry. Let's say that was the real reason. But the good reason they gave was your deal is if you're not funded, you're out. And you're not funded, goodbye. Why wouldn't that still be okay? Because they still had to give him a hearing, Your Honor. Just because they had good cause doesn't mean they don't have to go through the procedure to be fined. Well, but the issue under qualified immunity is whether a reasonable — a reasonable official could have believed that it wasn't necessary to give him a hearing. After they told him that this is what they're doing and he didn't answer. That's the qualified immunity question. And is it also true that he was — he did not communicate the moral equivalent of 10-year statement until the 11th hour? I don't believe it's the 11th hour. But, yes, Your Honor, the 23rd is the date. I would disagree with the Court's characterization. However, I don't — however, Your Honor, I don't believe it's necessary for Dr. Enberry to say, hey, I have these rights when it was — the rights were conveyed as a result of a comprehensive policy. The question is whether a reasonable official could have believed that it was not necessary to do what Dr. Enberry was asking. Your Honor, if I — if I might just finish and answer the question. If you do find that there was qualified immunity, that still means that we have the right to go against the university on the issue of an injunctive — of injunctive  So those are two separate issues. Sure, they are. But we believe that the university — the Allison case says they have the right to a hearing.  the hearing. And I think that's the point, ultimately, where this case comes down to. Just because they thought Dr. Enberry was going to lose a hearing and they had good cause doesn't mean they get to ignore the Constitution. I would submit on that, Your Honor. Wait, wait, wait, wait. I want to clarify the record on one point I've got, just this issue about this funding. Okay. It is not correct that this funding was in the bank just waiting to get dispersed. And we talk about that on pages 13 and pages 14 of our closing brief. That's fine. I can give you 10 seconds on what it was. No, we can read it. All right. Thank you. Unless the panel has any other questions, I know that I'm on an incredibly short time. You're on borrowed time. Thank you. Thank you. The case just argued is submitted for decision. We'll hear.
judges: Schroeder, Trott, Kleinfeld